**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| CASCADES AV LLC<br><br>Plaintiff,<br><br>vs.<br><br>EVERTZ MICROSYSTEMS, LTD.<br><br>Defendant. | Civil Action No. 1:17-cv-7881<br><br>**JURY TRIAL DEMANDED** |

## COMPLAINT FOR PATENT INFRINGMENT

Plaintiff Cascades AV LLC ("Cascades") complains of Defendant Evertz Microsystems, Ltd. ("Evertz") as follows:

### THE PARTIES

1.     Plaintiff Cascades is a Colorado limited liability company having a place of business at 2502 North Clark Street, Chicago, Illinois. Cascades holds total legal ownership of and has standing to sue for infringement of U.S. Patent Nos. 6,330,033, entitled "Pulse Detector for Ascertaining the Processing Delay of a Signal," 6,351,281, entitled "Delay Tracker," 6,836,295, entitled "Audio to Video Timing Measurement for MPEG Type Television Systems," 7,710,499, entitled "A/V Timing Measurement for MPEG Type Televisions," 8,810,659, entitled "Delay and Lip Sync Tracker," 9,071,723, entitled "AV Timing Measurement and Correction for Digital Television," 9,386,192, entitled "AV Timing Measurement and Correction for Digital Television," and 9,692,945, entitled "AV Timing Measurement and Correction for Digital Television," (collectively, the "Cooper Patents"). Mr. Cooper is a renowned and prolific inventor of more than 80 patents in the field of audio and video technology. The Cooper Patents

relate to improvements in ascertaining and correcting the processing delay of a signal that has become unsynchronized with other signals (such as when audio and video become unsynchronized), known generally as "lip sync error." Cascades is a subsidiary of Cascades Ventures, Inc., and was formed to help Mr. Cooper benefit from the licensing of his lip sync error correction inventions.

2.      Defendant Evertz is a Canadian corporation (with shares publicly traded on the Toronto Stock Exchange) having a principal place of business at Burlington, Ontario. Cascades contends that Evertz's IntelliTrak products and technology infringe at least U.S. Patent Nos. 8,810,659 (the '659 Patent), 9,071,723 (the '723 Patent) and 9,692,945 (the '945 Patent), as alleged below. Evertz has previously and is presently making, using, selling, offering for sale, and/or importing into the United States products that infringe, or whose use infringes, one or more claims of the '659, '723 and '945 Patents. Cascades reserves all rights to amend this Complaint to assert infringement against others of the Cooper Patents.

## JURISDICTION AND VENUE

3.      This action arises under the patent laws of the United States, e.g., 35 U.S.C. §§ 271, 281, 283-285. Subject matter jurisdiction exists under 28 U.S.C. §§ 1331 and 1338(a).

4.      Evertz has transacted business by making, using, selling, or offering to sell and distributing products, in this judicial district, that infringe the '659, '723 and '945 Patents. On information and belief, Evertz is not resident in the United States. Accordingly, this Court has personal jurisdiction over Evertz, and venue is proper in this Court under 28 U.S.C. § 1391(c) and/or 1400(b).

2

## FACTUAL BACKGROUND

### A.     The Accused Products Did Not Exist Before 2009

5.     Evertz registered the standard character word trademark "INTELLITRAK" with the U.S. Patent and Trademark Office as Registration No. 4,115,295, based on an application filed April 30, 2009. Evertz claimed rights under this mark for the fields of "lipsync analyzers," "signal processors for correcting time difference between audio and video signals," "software for use in measuring time difference between audio and video signals," "software for use in correcting time difference between audio and video signals," "video processors for measuring and correcting lipsync error," "audio processors for measuring and correcting lipsync error," and "software to measure and correct lipsync error." For this registration, Evertz indicated a first use, and first use in commerce, of the INTELLITRAK trademark of February 2009.

6.     Evertz did not commercialize the technology or products associated with INTELLITRAK (the Accused Products) before February 2009.

### B.     A March 10, 2008 Release and Covenant Does Not Apply

7.     On March 10, 2008, the inventor of the Cooper patents (J. Carl Cooper) entered into an agreement with Evertz entitled "MUTUAL RELEASE AND COVENANT NOT TO SUE" ("Release," attached as Exhibit A hereto).

8.     The Release was one of several documents related to settlement of an infringement dispute against Evertz involving a different family of patents and a different party.

9.      By its terms, the scope of the release granted in paragraph 2 of the Release applies only to "existing" patents, meaning patents that had issued as of the date of the agreement. Since that date (March 10, 2008), the '659, '723 and '945 Patents have issued.

10.     By its terms, paragraph 2 of the Release also restricts the scope of the release to claims for infringement that Cooper "could have brought." Similarly, the scope of the covenant not to sue in paragraph 4 is limited to "past or current products." Thus, the Release does not bar assertion of patents against product lines that did not exist as of March 10, 2008. This is true under both the paragraph 2 "release" language and the paragraph 4 "covenant" language.

11.     Two independent bases therefore exist for why the Release does not bar the assertions of this Complaint. First, its scope does not reach claims for infringement of patents issued after the date of the Release. And second, its scope does not reach claims for infringement against Evertz products first placed in commerce after March 10, 2008.

**C.      Evertz's Wilfulness and Attempts to Obstruct Cascades**

12.     Evertz has known of one or more of the Cooper Patents since at least approximately October 15, 2013, the date that Cascades' predecessor in interest sent a notice of infringement of many of those patents to Evertz. The notice of infringement included representative claim charts demonstrating Evertz's infringement of certain claims of the Cooper Patents via its INTELLITRAK technology, showing the 7800IDA8-3G, 7860IM2-HD, 7832SVP-3G, and their system and support products including 7800FR, 7801FR, 7700FC, 7700ACO2-HD+ICM, as being exemplary infringing products.

13.     This notice also identified the published application publication number corresponding to the '659 Patent (U.S. Publication No. 20120127365), showing that Evertz was practicing its claims. The infringed claims as issued are substantially identical to the form in which they appeared in the publication.

14.     Evertz ignored Cascades' predecessor. It did not respond to the October 15, 2013 letter. Evertz did receive the letter and appreciate its significance, though. On October 18, 2013, Evertz disclosed several of the identified Cooper Patents within a patent application covering INTELLITRAK technology as relevant prior art (Evertz's U.S. App. No. 12/705,264, which later issued as its U.S. Patent No. 8,754,947).

15.     By July 2, 2014, Cascades had acquired all relevant rights in the Cooper Patents. Cascades sent a follow-up communication on that date to Evertz, asking it to respond by July 31, 2014.

16.     On July 9, 2014, Evertz responded. In this response, it did not deny infringement, or state that any defense barred the claim. Instead, Evertz's counsel stated: "As part of a resolution between my client and Mr. Cooper which was entered into in December 2007 [sic] there was a Mutual Release and Covenant Not to Sue which specifically extends to the patents mentioned in your letter and parties such as your client. It is my suggestion that you discuss this issue with Mr. Cooper and/or his counsel." This July 9 letter, however, did not analyze paragraphs 2 or 4 of the Release. To do so would have required acknowledging that the Release does not actually apply. It was frivolous to imply that Cascades could not seek relief for infringement of any of the Cooper Patents.

17.     On July 17, 2014, Cascades responded by pointing out that the Release excludes products "that came into being in 2009," such as the INTELLITRAK products

accused of infringement. Cascades stated, "With this issue resolved, we look forward to your substantive response to the infringement notice and licensing invitation."

18.     Evertz ignored Cascades, and did not respond again, even to this July 17 communication.

19.     Cascades therefore wrote again on September 5, 2014 seeking a substantive response. This communication included an additional notice of infringement of the '659 Patent, which issued on August 19, 2014. Cascades also indicated that a legal basis existed for calculation of royalties under this patent back to October 2013.

20.     Though Evertz's counsel acknowledged the September 5 communication on September 10, 2014, and committed to a response in "several weeks," Evertz ignored Cascades again. It did not respond to the September 5 communication, either.

21.     On May 8, 2015, Cascades attempted again to address Evertz's infringement. On that date, Cascades' counsel wrote: "Looking through my correspondence, I notice that we have no reply on this Cascades AV license offer to Evertz. It's been about 10 months since we demonstrated that the prior agreement does not cover the present infringement. Please confirm we can continue license discussions. Thanks. Just as an FYI, I'm told that the recent NAB conference in Las Vegas continues to include infringing products."

22.     Evertz ignored Cascades again. It did not respond to the May 8 communication.

23.     On November 5, 2015, Cascades' counsel contacted Evertz's counsel by telephone. In that conversation, Evertz's counsel indicated that he had not yet studied the relevant contractual provisions of the agreement that he himself pointed to in his July 9,

2014 communication. He indicated needing until the next week to do so and get back to Cascades.

24.     Evertz ignored Cascades again. Its counsel did not get back to Cascades' counsel concerning the contract issue, or the infringement question.

25.     On December 16, 2015, Cascades' counsel communicated to Evertz's counsel by noting the previous phone conversation, and asking for a response. He responded the next day by promising a response by early "in the new year."

26.     Evertz ignored Cascades again, once more breaking its promise to engage in discussions. On January 15, 2016, Cascades' counsel wrote to set up a time to discuss the matter by telephone. On the same day, Evertz's counsel agreed to meet with Evertz and get back in touch on substance the next week.

27.     Evertz ignored Cascades again. Its counsel did not get back to Cascades' counsel the next week as he promised.

28.     On January 26, 2016, Cascades' counsel communicated to Evertz's counsel asking "Any update?" Evertz ignored Cascades again and did not respond.

29.     On February 18, 2016, Cascades' counsel wrote: "When we spoke almost a month ago, you mentioned a U.S. lawyer has gotten involved and might get in touch. We haven't heard anything, and no one from Evertz seems to have reached out. My client has been frustrated with the length of time it has taken to begin communicating on the topic of licensing. It would be in Evertz's best interests to respond very soon, starting with a monetary license offer. Thanks in advance."

30.     On March 6, 2016, for the first time in almost three years of interaction, Evertz substantively responded. In its counsel's letter, it did not deny infringement.

Instead, it stated that an "essential component" of the transactions surrounding the Release was that "Mr. Cooper, either directly or through any corporation, was to be precluded from suing Evertz for any patent related issue in the future or assisting any such proceeding." In the process, Evertz's counsel described Cascades' interpretation of the Release as "limited and very technical," and "antithetical to the intent of the parties as reflected in correspondence at the time the agreements were formed." The response also insinuated that "Cascades is under Mr. Cooper's control," such that "assistance he has provided to Cascades constitutes clear breaches of contractual covenants."

31.     Cascades was then involved in litigation pending in this Court against another accused infringer (Snell Advanced Media). By the summer of 2017, that matter settled, permitting Cascades to assess the three years of Evertz's refusal to engage in dialogue, and mistaken interpretations of the Release.

32.     On August 30, 2017, Cascades wrote to inform Evertz of the settlement, and to restart discussions, "proposing one final time to resolve this matter with Evertz without the need for litigation." The August 30 letter restated why Cascades' interpretation of the Release is correct, and corrected Evertz' misimpression that Mr. Cooper "controls" Cascades. The letter went on to cite case law decisions that reject Evertz's effort to invoke "intent of the parties" to a contract outside of the "objective manifestation of their intent" – the words of the contract itself. The letter closed with a notice of infringement of the newest Cooper Patent to issue, the '945 Patent.

33.     Evertz ignored Cascades again. In a subsequent September 19, 2017 telephone call between Cascades counsel and Evertz counsel, the latter indicated that he was "instructed to prepare a response" to the August 30 letter. On October 16, 2017,

Evertz counsel wrote to express a "hope" to be in a position to provide that response after returning from a trip to Europe. Cascades never received any such response.

34. Since the first notice of infringement and in every communication thereafter, Evertz has never denied infringement or questioned the validity of the Cooper Patents. Evertz instead raised a nonmeritorious contract defense after waiting nearly three years to do so, and continued a pattern of disregarding and ignoring Cascades when it pointed out its deep and obvious flaws.

**D. Evertz Infringes the '659, '723 and '945 Patents**

35. Evertz sells its products to customers in the United States including television networks, which use its INTELLITRAK technology. Evertz's products also operate with network monitoring and network control systems to monitor lip sync information for excessive errors.

36. Infringing Evertz products (the "Accused Products") include, but are not limited to:

VistaLINK® PRO
7800IDA8
7800IDA8-3G
7822AE8-3G
7822AE4-3G
7822AD8-3G
7822AD4-3G
7848FSE-3G
5601MSC
7860IM2-HD
7832SVP-3G, 7832SVP-444-3G family
7848FSE
 7860IM2-HD
7832SVP- 3G
7800FR
7801FR
7700FC
7700ACO2-HD+ICM

9

520DD-AESU
520AD8-HD
520AE4-HD
520AE8-HD
7720AD8-DD-HD family
7720AD-A4-2
7720AD4
7720AD4-B family
7720AE4 (VistaLINK Pro controllable audio delay for lip sync correction)
7721AD4-HD,
7721AD-A4-HD
7721AD-A4-2HD & 7721AD4-B-HD family
7721AD8-HD & 7721AD8-B-HD family
7721AE-A4 (VistaLINK Pro controllable audio delay for lip sync correction)
7721AE4-HD & 7721AE4-B-HD family (VistaLINK Pro controllable audio delay for lip sync correction)
7721AE8-DEE-HD (Audio Embedder with VistaLINK Pro controllable audio and video delays for lip sync correction)
7721AE8-HD & 7721AE8-B-HD
7721DD4-HD
7721DE4-HD
7821AD8-3G
7821AD8-3G-AESD
7821AD8-B-3G
7821AD8-LTC-3G family
7821AE8-3G
7821AE8-3G-AESD
7821AE8-B-3G
7821AE8-LTC-3G family.

## COUNT I

## INFRINGEMENT OF THE '659 PATENT

37.     Cascades hereby incorporates paragraphs 1-36 above by reference.

38.     Evertz has directly infringed and continues to directly infringe at least claim 1 of the '659 Patent through using, selling and/or importing its INTELLITRAK-equipped or optional Accused Products. Evertz uses the infringing products at various trade shows in the United States, and, on information and belief, in testing.

39. Evertz has also knowingly (since its issuance on August 19, 2014, and at least since September 5, 2014) and intentionally actively aided, abetted and induced others to directly infringe at least one claim of the '659 Patent (such as its customers in this judicial district and throughout the United States). Evertz continues to induce infringement of the '659 patent. Evertz has contributorily infringed and is a contributory infringer because, with knowledge of the '659 Patent (since its issuance on August 19, 2014, and at least since September 5, 2014), it supplies a material part of a claimed combination, where the material part is not a staple article of commerce, and is incapable of substantial noninfringing use. Evertz contributes to its customers' infringement because, with knowledge of the '659 Patent, it supplies the technology that allows its customers to infringe the patent.

40. Evertz's infringement of the '659 Patent has been and continues to be willful and deliberate. Evertz has refused to respond in good faith to Cascades' notices and attempts to discuss the Cooper Patents or the possibility of licensing them. This failure to engage includes Evertz promising to send detail of its positions, but then failing to communicating again.

41. Claim 1 is an exemplary infringed claim. Its preamble states: "A method of tracking an audio or video signal having an active portion which signal is selected from a plurality of signals for at least its active portion to be passed through a first processing circuitry in a television system, said method including the steps of:"

42. Evertz Accused Products operate in the environment of television systems and thus have the "active portion" of an "audio or video signal" as named in the

preamble. For example, the image of the video is passed through processing circuitry in a television system.

43.     After the preamble, the first limitation of claim 1 states: "a) In response to artifacts already present in the active portion of an electronic first input signal which is input to a first processing circuit, associating a plurality of first input delay trackers with said first input signal, each said first input delay tracker corresponding to at least one said artifact of said first input signal."

44.     Evertz Accused Products practice this first limitation. These products contain circuitry that associates artifacts in a television signal (express characteristic components) with a first plurality of fingerprints ("first input delay trackers").

45.     After the first limitation, the second limitation of claim 1 states: "b) in response to artifacts in a first output signal from said first processing circuit, associating a plurality of first output delay trackers with said first output signal, each said first output delay tracker corresponding to at least one said artifact of said first output signal."

46.     Evertz Accused Products practice this second limitation. These products associate fingerprints with the television signal at a destination point, derived from artifacts in the signal.

47.     After the second limitation, the third and final limitation of claim 1 states: "in response to a plurality of said first input delay trackers and a plurality of said first output delay trackers, determining if a version of said first input signal is being output from said first processing circuit as said first output signal."

48.     Evertz Accused Products practice this third limitation. These products analyze fingerprints from the origin point and fingerprints from the destination point and compare them for purposes that include lip sync error measurement.

49.     As a direct and proximate consequence of the infringement, Cascades has been, is being, and, unless such acts and practices are enjoined by the Court, will continue to be injured in its business and property rights, and has suffered, is suffering, and will continue to suffer injury and damages for which it is entitled to relief under 35 U.S.C. § 284 adequate to compensate for such infringement, but in no event less than a reasonable royalty.

## COUNT II

### INFRINGEMENT OF THE '723 PATENT

50.     Cascades hereby incorporates paragraphs 1-49 above by reference.

51.     Evertz has directly infringed and continues to directly infringe at least claim 1 of the '723 Patent through using, selling and/or importing its INTELLITRAK-equipped or optional Accused Products. Evertz uses the infringing products at various trade shows in the United States, and, on information and belief, in testing.

52.     Evertz has also knowingly (since its issuance on June 30, 2015) and intentionally actively aided, abetted and induced others to directly infringe at least one claim of the '723 Patent (such as its customers in this judicial district and throughout the United States). Evertz continues to induce infringement of the '723 patent. Evertz has contributorily infringed and is a contributory infringer because, with knowledge of the '723 Patent (since its issuance), it supplies a material part of a claimed combination, where the material part is not a staple article of commerce, and is incapable of substantial

noninfringing use. Evertz contributes to its customers' infringement because, with knowledge of the '723 Patent, it supplies the technology that allows its customers to infringe the patent.

53.     Evertz's infringement of the '723 Patent has been and continues to be willful and deliberate. Evertz has refused to respond in good faith to Cascades' notices and attempts to discuss the Cooper Patents or the possibility of licensing them. This failure to engage includes Evertz promising to send detail of its positions, but then failing to communicating again.

54.     Claim 1 is an exemplary infringed claim. Its preamble states: "In a digital television system including a transmit section having i) a first signal which carries an image which is a television image, ii) a second signal which is a single or multi-channel audio signal and which second signal may be carried by or with the first signal or separately and iii) a plurality of markers, each responsive to at least one characteristic of the audio signal, and associated in time with the image carried by the first signal before the first and second signals and the plurality of markers are conveyed via a transmission channel to arrive at a receive section in delayed form, the receive section including an apparatus for determining the relative timing of the first signal and the second signal at said receive section, said apparatus comprising:"

55.     Evertz Accused Products function in a digital television system including a transmit section and a receive section. The transmit section has a first signal which carries a television image and a second signal which is a single or multi-channel audio signal. The second signal may be carried by or with the first signal or separately. The Accused Products operate in the environment of digital television systems and have the

recited "first signal," "second signal" and "plurality of markers." For example, the products generate and act on fingerprints, each responsive to at least one characteristic of the audio and/or video signal. The receive section measures lip sync error.

56. After the preamble, the first limitation of claim 1 states: "a) delayed marker separator circuitry responsive to a plurality of markers associated with a first signal's delayed television image in digital form and providing a first delayed plurality of markers."

57. Evertz Accused Products practice this first limitation. These products contain circuitry that separates a first plurality of fingerprints in a delayed television image signal to provide these delayed fingerprints ("first delayed plurality of markers").

58. After the first limitation, the second limitation of claim 1 states: "b) delayed marker generating circuitry responsive to a second signal's delayed audio and generating a second plurality of delayed markers in response to a plurality of characteristic of said second signal in digital form, which characteristics include at least the relationship between a plurality of energy related amplitude characteristics over differing ranges of frequencies of said second signal."

59. Evertz Accused Products practice this second limitation. These products generate fingerprints for the delayed television signal by operating on energy related amplitude characteristics of the audio over different frequency ranges. Such characteristics include one or more of: (1) the envelope of audio signal amplitude, (2) the average loudness level, (3) the peak formant of the audio signal, and (4) the average zero crossing rate.

60.     After the second limitation, the third limitation of claim 1 states: "c) relative timing comparison circuitry responsive to corresponding pairs of said first plurality of delayed markers of a) and said second plurality of delayed markers of b) thereby indicating which of said first signal and said second signal arrived earliest at said apparatus."

61.     Evertz Accused Products practice this third limitation. These products compare the fingerprints to determine which signal arrived at the destination point first. Specialized software compares fingerprints at the destination point.

62.     After the third limitation, the fourth and final limitation of claim 1 states: "d) wherein each of said circuitry of elements a), b) and c) comprises electronic analog and/or digital hardware."

63.     Evertz Accused Products practice this fourth limitation. These products use analog and/or digital hardware as claimed for the circuitry noted in preceding paragraphs.

64.     As a direct and proximate consequence of the infringement, Cascades has been, is being, and, unless such acts and practices are enjoined by the Court, will continue to be injured in its business and property rights, and has suffered, is suffering, and will continue to suffer injury and damages for which it is entitled to relief under 35 U.S.C. § 284 adequate to compensate for such infringement, but in no event less than a reasonable royalty.

## COUNT III

## INFRINGEMENT OF THE '945 PATENT

65.     Cascades hereby incorporates paragraphs 1-64 above by reference.

66.     Evertz has directly infringed and continues to directly infringe at least claim 1 of the '945 Patent through using, selling and/or importing its INTELLITRAK-equipped or optional Accused Products. Evertz uses the infringing products at various trade shows in the United States, and, on information and belief, in testing.

67.     Evertz has also knowingly (since its issuance on June 27, 2017, and at least since August 30, 2017) and intentionally actively aided, abetted and induced others to directly infringe at least one claim of the '945 Patent (such as its customers in this judicial district and throughout the United States). Evertz continues to induce infringement of the '945 patent. Evertz has contributorily infringed and is a contributory infringer because, with knowledge of the '945 Patent (since its issuance on June 27, 2017, and at least since August 30, 2017), it supplies a material part of a claimed combination, where the material part is not a staple article of commerce, and is incapable of substantial noninfringing use. Evertz contributes to its customers' infringement because, with knowledge of the '945 Patent, it supplies the technology that allows its customers to infringe the patent.

68.     Evertz's infringement of the '945 Patent has been and continues to be willful and deliberate. Evertz has refused to respond in good faith to Cascades' notices and attempts to discuss the Cooper Patents or the possibility of licensing them. This failure to engage includes Evertz promising to send detail of its positions, but then failing to communicating again.

69.     Claim 1 is an exemplary infringed claim. Its preamble states: "An apparatus for generating a first set of markers in response to a relatively undelayed audio signal having one or a plurality of channels which is part of a digital television program

having video comprised of frames and known number of audio samples corresponding to each frame according to one or more digital television standard which first set of markers are intended to be utilized with a second set of markers generated in response to a delayed version of the audio signal to determine delays of audio relative to video portions of the digital television program, the apparatus including:"

70.     Evertz Accused Products practice the preamble. For example, they generate a first set of audio fingerprints (from an undelayed digital television program) and a second set of audio fingerprints (from a delayed version of the same digital television program), where the program comprises frames according to a digital television standard. These sets are used to measure lip sync error.

71.     After the preamble, the first limitation of claim 1 states: "a) an input circuit responsive to one channel or a combined plurality of channels of the digital audio portion of a digital television program to provide a first digital output portion capable of carrying the audio energy present in said channel or said combined plurality of channels over a first range of audio frequencies."

72.     Evertz Accused Products practice this first limitation. These products can treat the audio in different selectable ways. They can analyze 5.1 surround as a single entity, or look at discrete channels where it compares left with left, right with right, for example, and generate lip-sync errors for each. Evertz audio de-embedders are capable of separating out digital audio from digital television signals. The digital audio as present in such digital signals carries the audio energy as claimed.

73.     After the first limitation, the second limitation of claim 1 states: "b) an input filter circuit comprising a digital filter responsive to said first digital output portion

to pass energy present therein which is within a second range of audio frequencies less than said first range of audio frequencies to provide a digital filter output, said input filter circuit operating to provide a first series of binary bits when said digital filter output is activated indicating the presence of energy at audio frequencies passed by said digital filter thus generating a set of binary bits per frame of video."

74.     Evertz Accused Products practice this second limitation. These products filter digital audio such that a digital output is derived from a limited range of frequencies. Measured characteristics include: include (1) the envelope of audio signal amplitude, (2) the average loudness level, (3) the peak formant of the audio signal, and/or (4) the average zero crossing rate; all of which implicate the use of a digital filter operating on a limited frequency range.

75.     After the second limitation, the third and final limitation of claim 1 states: "c) a marker generator circuit responsive to said first series of binary bits to provide a series of master markers for each frame of video which is a smaller series of binary bits relative to said first series of binary bits, said marker generator further responsive to the digital video portion of said digital television program to relate the timing of said master markers to the timing of said digital video portion."

76.     Evertz Accused Products practice this third limitation. These products generate fingerprints usable for lip sync error measurement that contain two bytes (sixteen bits), and as such are master markers comprising a smaller series of binary bits relative to the bits provided by the input filter circuit, each associated with a frame of video.

77.     As a direct and proximate consequence of the infringement, Cascades has been, is being, and, unless such acts and practices are enjoined by the Court, will continue to be injured in its business and property rights, and has suffered, is suffering, and will continue to suffer injury and damages for which it is entitled to relief under 35 U.S.C. § 284 adequate to compensate for such infringement, but in no event less than a reasonable royalty.


**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff Cascades asks this Court to enter judgment against Evertz and against its respective subsidiaries, affiliates, agents, servants, employees and all persons in active concert or participation with it, granting the following relief:

A.     An award of damages adequate to compensate Cascades for the infringement that has occurred, together with prejudgment interest from the date infringement of the '659, '723 and '945 Patents began and statutory costs;

B.     An award to Cascades of all remedies available under 35 U.S.C. §§ 284 and 154;

C.     An award to Cascades of all remedies available under 35 U.S.C. § 285;

D.     A permanent injunction prohibiting further infringement, inducement and contributory infringement of the '659, '723 and '945 Patents; and,

E.     Such other and further relief as this Court or a jury may deem proper and just.

## JURY DEMAND

Cascades demands a trial by jury on all issues so triable.


Dated:   November 1, 2017


Cascades AV LLC

By: /s/ Robert P. Greenspoon_____
Robert P. Greenspoon
FLACHSBART & GREENSPOON, LLC
333 North Michigan Avenue, Ste 2700
Chicago, IL  60601
T:  312-551-9500
F:  312-551-9501

**Attorney for Plaintiff**
**Cascades AV LLC**