**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| CASCADES AV LLC<br><br>　　　　　Plaintiff,<br><br>　vs.<br><br>EVERTZ MICROSYSTEMS, LTD.<br><br>　　　　　Defendant. | Civil Action No. 1:17−cv−07881<br><br>Honorable Thomas M. Durkin |

**CASCADES AV'S MEMORANDUM IN OPPOSITION TO EVERTZ'S
MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM UNDER RULE 12(B)(6)**

**I.     INTRODUCTION**

"[P]atent license agreements can be written to convey different scopes of promises not to sue, *e.g.*, a promise not to sue under a specific patent or, more broadly, a promise not to sue under any patent the licensor now has or may acquire in the future." *Endo Pharma., Inc. v. Activis, Inc.*, 746 F.3d 1371, 1379 (Fed. Cir. 2014) (internal quotation and citation omitted). Defendant Evertz Microsystems ("Evertz") is skilled at negotiating complex intellectual property deals of such "different scopes." For example, Evertz has entered into relevant agreements defining the scope of covered rights broadly: "any related applications or patents obtained . . . via any . . . continuations, continuations-in-part, ***divisionals***, reissues or reexaminations of [specified individual] patents or any foreign counterparts thereof." (Exhibit A ¶ 1.d.iii; Exhibit B ¶ 1.d.x) (emphasis added). In sharp distinction, Evertz has also entered an agreement for only "existing patents" meeting a certain definition, without mention of related applications or divisionals. (Exhibit C ¶ 2). It knows what it is doing. The Federal Circuit demands such precision. In the words of the Federal Circuit: "You get what you bargain for." *Endo*, 746 F.3d at 1378.

Evertz now moves to get more than it bargained for. It seeks dismissal under Fed. R. Civ. P. 12(b)(6) based on the defenses of express and implied license. Evertz invokes an agreement (for which it paid $1.00) intended to deliver narrow rights. (Ex. C at 1). Evertz does not dispute that the covered patents (defined as "Cooper Patents") are solely "existing patents," *i.e.*, including only patents that had issued to J. Carl Cooper as of March 10, 2008. (Ex. C, ¶ 2, defining "Cooper Patent" as "any existing patent presently or formerly owned or controlled by him or by any company owned or controlled by him or that might hereafter revert to him."). Evertz mentions only one patent in its briefing as a "Cooper Patent" under this agreement – one that ***did*** exist as an issued patent as of March 10, 2008: U.S. Patent No. 6,836,295.

Evertz nonetheless contends that this agreement includes a covenant not to sue precluding assertion of three other patents that did not yet exist, even in application form, as of March 10, 2008. Evertz further asserts that this agreement immunizes a product line that did not yet exist as of March 10, 2008 ("INTELLITRAK"). Evertz is wrong. Cascades respectfully requests that the Court deny Evertz's motion to dismiss.

## II.   FACTUAL BACKGROUND

The Complaint refers to the agreements of Exhibits A and B under Fed. R. Civ. P. 10(c) (Dkt. No. 1, at ¶ 8), and attaches Exhibit C as its own exhibit (lodged at Dkt. No. 1-1). The first two Evertz agreements (Exs. A and B) involve settlement of certain claims by third parties asserting patents invented by Mr. Cooper. Evertz acknowledges that they may be considered under Rule 12(b)(6). (Dkt. No. 20, at 3). Meanwhile, Exhibit C is the basis of Evertz's license defense – the March 10, 2008 Mutual Release and Covenant Not to Sue between Evertz and Mr. Cooper concerning his "existing patents" (the "Mutual Release").[1]

The various simultaneous agreements show the distinct ways that Evertz worded the rights it intended to receive. The first two agreements spelled out particular patents by number, ending with inclusion of all "related applications," using the following form of language:

> and any related applications or patents obtained by [TLC / Patentees], or any successors-in-interest or assigns, via any foreign or domestic continuations, continuations-in-part, *divisionals*, reissues or reexaminations of the ['250 or '869 / '780, '637, '964, '741, '594, '869B2, '049, '057 or '707] patents or any foreign counterparts thereof.

---

[1] Evertz sued Mr. Cooper in California state court for breach of contract, after Cascades filed the present suit. (Dkt. No. 20, at 1 n.2). Evertz admits that it served discovery (*id.*), disregarding this Court's order that "No discovery will commence without further order of the Court." (Dkt. No. 17). Evertz's motion does not attempt to justify its actions in view of the Court's discovery prohibition. This Court might have the authority to enjoin Evertz from proceeding with discovery in its second-filed suit, even though the second-filed suit is a state court action. *Winkler v. Eli Lilly & Co.*, 101 F.3d 1196, 1201 (7th Cir. 1996) (Anti-Injunction Act does not deprive federal district court of the "authority to issue an injunction against these plaintiffs to protect the integrity of his pre-trial ruling [denying discovery].").

(Ex. A ¶ 1.d.iii; Ex. B ¶ 1.d.x) (emphasis added). Evertz therefore knew how to bargain for and obtain rights to future "divisional" applications and patents. In sharp contrast, the March 10, 2008 Mutual Release includes paragraph 2, which states as follows:

> 2. Cooper hereby releases Evertz with respect to any and all claims that he *could have brought* in any proceeding against Evertz for infringement of any *existing patent* presently or formerly owned or controlled by him or by any company owned or controlled by him or that might hereafter revert to him ("Cooper Patent"), with respect to any past, present or future products, methods, services or systems of Evertz that previously, currently, or in the future are made, used, sold, offered for sale, imported or exported by Evertz.

(Ex. C, emphasis added). Here, Evertz did not bargain for, nor receive, rights to future "divisional" applications or patents, but rather "any existing patent" meeting a certain definition.

As the agreement spells out, the rights granted in paragraph 2 apply only to "existing" patents, meaning patents that had issued as of the date of the agreement. Evertz does not dispute that the patents involved in this lawsuit issued long after March 10, 2008 (*i.e.*, issue dates of August 19, 2014, June 30, 2015 and June 27, 2017, respectively). The patents-in-suit are therefore not "Cooper Patents" as that term is defined in the agreement.

"Release" rights are backward looking, and "covenant" rights are forward looking. *Cascades Computer Innovation, LLC v. Samsung Elecs. Co.*, 70 F. Supp. 3d 863, 869-70 (N.D. Ill. 2014). Consistently, paragraph 2 focuses on the day it came into force (March 10, 2008), and surrenders rights from Cooper to Evertz for $1.00 that he possessed on that date – *i.e.*, "could have brought" rights. Paragraph 2 does not encompass unknown future-developed commercial products post-dating March 10, 2008.[2]

---

[2] The word "future" appears twice in paragraph 2, but this does not create any ambiguity. As of March 10, 2008, Cooper hypothetically "could have brought" a claim for infringement of one of his existing patents against a known "future product" of Evertz, by seeking a declaratory judgment of infringement. *Lang v. Pacific Marine & Supply Co.*, 895 F.2d 761, 764 (Fed. Cir. 1990) (patentee may seek declaration of infringement against a future infringer as long as the case-or-controversy requirement is satisfied).

3

Also consistent with the usual practice in patent agreements, the parties included a separate term (paragraph 4) for delivery of future rights. Paragraph 4 states as follows:

> 4. Cooper hereby covenants that neither he nor any company owned or controlled by him will bring suit, initiate any proceeding or otherwise assert any claim, assist voluntarily in the prosecution of any claim, or receive or direct to any third party any payments arising from the prosecution or settlement of any claim, apart from payments arising from the Licensing Agreements, against Evertz or its affiliates, customers, distributors, resellers, OEMs or end-users of its ***past or current products***, methods, services or systems before any court or administrative agency in any country in the world, ***based upon or arising out of any Cooper Patent***.

(Ex. C, emphasis added).

By its terms, the scope of the covenant not to sue in paragraph 4 is limited (like paragraph 2) to "Cooper Patents." Thus it applies solely to "existing patents," a type that excludes the patents-in-suit. The scope of the covenant is also limited to "past or current products." Thus, the covenant language (like the release language) does not bar assertion of patents against product lines that did not exist as of March 10, 2008. It is undisputed that Evertz did not commercialize the technology or products associated with INTELLITRAK (the accused products) before March 10, 2008. (Dkt. No. 1, at ¶ 5 (noting 2009 "first use in commerce")).

## III. ARGUMENT

If Evertz's present arguments were sound, Evertz would have made them to Cascades at some point during the four years prior to this suit. But that did not happen. The Complaint catalogues Evertz's four years of history with Cascades, during which time Evertz did not engage Cascades' good faith attempts to begin licensing discussions. (Dkt. No. 1, at ¶¶ 12-34). At no time before forcing Cascades to file suit did Evertz contend that its rights to infringe derive from any purported rights under the '295 patent, contend that covenant-not-to-sue language reaches "future" Evertz products, or contend that it possessed any form of implied license rights.

4

The Complaint sets forth Evertz's original rationale for claiming license rights. Evertz originally contended that "Mr. Cooper, either directly or through any corporation, was to be precluded from suing Evertz for *any* patent related issue in the future or assisting any such proceeding." (Dkt. No. 1, ¶ 30, emphasis added). Even Evertz's litigation counsel does not advance this original argument. Evertz's new theories, tailored specially for this motion, are equally meritless.

To prevail, Evertz must win both arguments under its express license theory: (1) that the covenant language "arising out of" delivers rights in divisional patents that trace back to the '295 "Cooper Patent," even if such patents did not exist on March 10, 2008; and (2) that the covenant is not limited to "past or current products" of Evertz as of that date. Alternatively, Evertz must show entitlement to an implied license by legal estoppel, proving that Cascades' patent assertions "derogate from" rights Evertz received in the covenant not to sue under the '295 patent. Evertz cannot meet its heavy burden under any theory, especially under Rule 12(b)(6).

**A. Evertz Did Not Bargain For Or Receive Express License Rights to the Patents-in-Suit**

Evertz properly abandoned its pre-suit theory that patents issuing in 2014 and later constitute "existing" patents as of 2008. It instead conveniently picks an "existing" patent as of 2008 (the '295 patent) and contends that the claims of this lawsuit "arise out of" that patent. (Dkt. No. 20, at 8-11). Evertz's new focus on "arising out of" language fares no better than the theory it abandoned. Evertz's argument that one patent might "arise out of" another patent is irrelevant, since the contract language asks whether a *suit* (not a *patent*) "arises out of" a patent.

The Federal Circuit in a persuasive decision has rejected Evertz's argument. *See Diversified Dynamics Corp. v. Wagner Spray Tech Corp.*, 106 Fed. Appx 29 (Fed. Cir. 2014) (nonprecedential). In *Diversified*, the Federal Circuit confronted identical language. The licensor (Diversified) promised not to sue the licensee (Wagner) "regarding any and all actions, claims, . .

5

. causes of action, . . . and demands, known or unknown, ***arising out of*** or in any way related to the '176 Patent . . . ." *Id.* at 30 (emphasis added). Diversified then sued Wagner for infringement under the '123 patent, which was "related to," a "companion" of, and cross-referenced in, the '176 patent, and repeated verbatim "significant portions" of the licensed patent. *Id.* at 30-31.

The Federal Circuit reversed the district court's express license finding, because the "phrases 'arising out of' and 'in any way related to' refer back to the '176 patent and require a relationship between the action and the patent itself." *Id.* at 32. The Court stated that "the action arises out of and is related to the '123 patent," not the '176 patent. *Id.* The lower court's analysis "erroneously focus[ed] on the relatedness of the '123 patent to the '176 patent, not the relatedness of the action to the '176 patent," whereas "we must focus on the connection between the *action* and the '176 patent, not the connection between a *patent* and the '176 patent." *Id.* (emphasis in the original). "By concluding that Diversified released Wagner from the current suit, the [district] court erroneously prohibited actions 'arising out of or in any way related to [*a patent related to*] the '176 Patent.'" *Id.* at 33 (emphasis and alteration in the original). Thus the "arising out of" language is "narrowly tailored" ***not*** to be a release of all claims. *Id.*

Here Evertz advances the identical theory rejected by the Court of Appeals. Evertz states that "progeny patents (including divisional patents) 'arise out of' or 'arise from' their parent patents." (Dkt. No. 20, at 9, citing cases). This misplaces the focus in the same way that the district court did before its reversal in *Diversified*. Evertz asserts that the patents-in-suit somehow "arise out of" the '295 patent. That is irrelevant. The covenant of paragraph 4 in this case at most concerns ***suits, proceedings or claims*** that "arise out of" the '295 patent. It is irrelevant if a patent "arises out of" a patent, when the contract language turns attention to whether a ***suit*** "arises out of" a patent. This suit does not "arise out of" the '295 patent, for the

6

same reason that the suit in *Diversified* did not "arise out of" the '176 patent: Cascades did not include the '295 patent among the patents it claims Evertz infringes.

Evertz did not cite *Diversified* in its motion. Worse, even if the theory rejected in *Diversified* had some merit (it does not), Evertz does not explain how its express license defense might succeed in view of its admission at footnote 8. There, Evertz admits that "divisional" patents (the type involved here) are for an "independent or distinct invention, carved out of a nonprovisional application." (Dkt. No. 20, at 6 n.8, citing MPEP § 201.08). A suit "arising out of" one patent cannot "arise out of" another patent for an "independent or distinct invention."

Evertz tries, but fails, to point to an inconsistency in applying the Federal Circuit's holding to the facts of this case. Evertz points to language in paragraph 2 as limited to "infringement of" a Cooper Patent, suggesting paragraph 4's suits "arising out of" a Cooper Patent must be broader than just infringement cases. Evertz ignores the multitude of suit-types that might hypothetically "arise out of" the '295 patent without being infringement suits. These could include, as examples, claims for a correction of inventorship (35 U.S.C. § 256) or claims of "interfering" or "derived" patents (35 U.S.C. § 291, pre- and post-AIA). No inconsistency results from applying the Federal Circuit's (and Cascades') understanding of the law to the facts of this case. The "arising out of" wording in paragraph 4 can be broader than the rights language of paragraph 2 without the strained and erroneous interpretation that Evertz seeks.

Finally, Evertz also fails to distinguish the other, independent reason why the covenant of paragraph 4 does not apply – the undisputed fact that INTELLITRAK is a future-developed product line that did not exist as of March 10, 2008. INTELLITRAK is not one of "its past or current products." To evade the consequences of this fact, Evertz makes the odd claim that "past or current products" in paragraph 4 modifies only "end users." (Dkt. No. 20, at 11). In other

7

words, Evertz contends that it signed an agreement with the intent to permit Mr. Cooper to bring suit under Cooper Patents against its "end users" of future products like INTELLITRAK, so long as he did not bring suit against Evertz itself.

Evertz's strained reading defies commercial reality. Evertz would only have intended a bargained-for covenant that was identical in scope, regardless of whether the beneficiary was an end user or Evertz itself. Meanwhile, Evertz points to nothing ambiguous about wording that no suit of a certain type can be brought "against Evertz . . . of its past or current products." While the language might be turgid, it is still clear. The word "of" means "concerning." This phrase therefore means "against Evertz concerning its past or current products." This straightforward and unambiguous interpretation dooms Evertz's express license argument. The covenant omits immunity for "future" products, identically for Evertz and end users alike.

Cascades' interpretation of the parties' chosen contractual wording is the only one consistent with public policy. Waivers of future unknown intellectual property claims are unenforceable, since they are against public policy. *FASA Corp. v. Playmates Toys, Inc.*, 892 F. Supp. 1061, 1067 (N.D. Ill. 1995); *see also FDIC v. FBOP Corp.*, No. 14 CV 4307, 2017 U.S. Dist. LEXIS 194133, at 37-*39 (N.D. Ill. Nov. 27, 2017) (Durkin, J.) (applying Illinois law that clause limiting liability not enforceable under Illinois law if contrary to public policy) ("To enforce the broad language of the Release against such an unexpected, wholly fortuitous event would allow FBOP to reap a huge, undeserved windfall."). The covenant therefore does not reach INTELLITRAK – an independent reason for denying the express license motion.

    **B.    Evertz Did Not Bargain For Or Receive Implied License Rights to the Patents-in-Suit**

Evertz's alternative argument for dismissal also fails. Evertz contends that if the Court holds that the parties did not manifest a mutual intent for Evertz to receive rights to the patents-

in-suit under the covenant of paragraph 4 (*i.e.*, holds no express license), the doctrine of "implied license by legal estoppel" bestows those rights upon Evertz anyway. Evertz is wrong. Courts do not grant parties like Evertz such a "windfall" under these circumstances. *Endo*, 746 F.3d at 1377 (describing misapplication of implied license defense as improper "windfall" to the licensee). This Court too, like the Federal Circuit, holds parties to their choice of language within legal documents that might implicate progeny patents like continuations. *Hagenbuck v. Sonrai Sys.*, 130 F. Supp. 3d 1213, 1216 (N.D. Ill. 2015) (Durkin, J.) ("If he had intended the disclaimer to apply more broadly [than to 'continuations'], he could have said so.").

Implied license by legal estoppel is a developing area. "[I]t 'refers to a *narrow category of conduct* encompassing scenarios where a patentee has licensed or assigned a right, received consideration, and then sought to derogate from the right granted.'" *Endo*, 746 F.3d at 1377 (quoting *TransCore, LP v. Elec. Trans. Consultants Corp.*, 563 F.3d 1271, 1279 (Fed. Cir. 2009)) (emphasis by *Endo* panel). Several reasons prevent Evertz from meeting its burden to expand the "narrow" defense to reach the facts of this case.

First, Evertz has not tried to show any derogation from "the scope of the licensed claims" from 2008. *See id.* Second, the 2008 agreement evidences mutual intent to **exclude** future divisional patents tracing lineage back to any patent that might otherwise be covered, and that mutual intent must be respected even when considering implied licenses. *Id.* at 1378. Third, the present lawsuit does not concern the same products at issue when Evertz executed the 2008 agreement. *Id.* And fourth, Evertz has not shown that implied license by legal estoppel can bind a third party successor to the relevant express license. *Spindelfabrik Suessen-Schurr, Stahlecker & Grill GmbH v. Schubert & Salzer Maschinenfabrik Aktiengesellschaft,* 829 F.2d 1075, 1080-81

(Fed. Cir. 1987) (emphasizing "grantor" cannot take back that for which he received consideration, holding that defense did not reach "a suit by a third party").[3]

### 1. History of the Implied License Defense

The seminal decision applying implied license by legal estoppel arose out of a unique factual scenario bearing no resemblance to the present case. One of the predecessor courts to the Federal Circuit considered a license of the "Subject Invention" within a patent (the Byrem patent) granted by AMP to the U.S. Government. *See AMP Inc. v. United States*, 389 F.2d 448, 450 (Cl. Ct. 1968). After granting a royalty-free license in the Byrem patent inventions to the Government, AMP discovered that the Government bought the exact embodiment of that patent from a third party. *Id.* at 451. Feeling jilted for not getting the contract, AMP then acquired an earlier "dominating" patent (the Vinson patent) from a third party. *Id.* (explaining Vinson "dominated" Byrem because "the wire-splicing device produced according to the disclosure of the Byrem Patent infringed the prior Vinson Patent."). These facts gave rise to an implied license by legal estoppel, on the grounds that suing under the Vinson patent had the effect of "derogating" from the rights granted to make the "invention" disclosed in the Byrem patent. *Id.* at 454-56. This holding was "the logic driving *TransCore* and *General Protecht [Group, Inc. v. Leviton Mfg. Co., Inc.*, 651 F.3d 1355 (Fed. Cir. 2011)]." *Endo*, 746 F.3d at 1381.

*TransCore* and *General Protecht* expanded the *AMP* holding, but not as far as the facts of this case.

In *TransCore*, the Federal Circuit again considered a patent assertion against the same product previously licensed by a patentee (certain automated toll collection systems). 563 F.3d at

---

[3] A fifth reason also exists. When the underlying express contract is merely a covenant not to sue under specified patents, and not a license, no legal estoppel arises. *Spindelfabrik*, 829 F.2d at 1081 n.8. Any suggestion to the contrary in later Federal Circuit decisions must yield to the longstanding principle that an earlier appellate decision controls when there is a conflict between earlier and later ones. *Vas Cath Inc. v. Mahurkar*, 935 F.2d 1555, 1563 (Fed. Cir. 1991).

1273. The court rejected the argument that *AMP* limited implied license by legal estoppel to future acquisition of *earlier* patents. *Id.* at 1279 ("we see no reason for so fine a distinction"). The court therefore expanded the defense to continuation patents pending as applications but not yet issued as of the time of the earlier agreement, where the future-issuing patent had claims "broader than, and necessary to practice" a patent from the earlier agreement. *Id.* at 1279. The court concluded that "in order for [the licensee] to obtain the benefit of its bargain with TransCore, it must be permitted to practice the [continuation] patent to the same extent it may practice the [expressly licensed parent] patents." *Id.* The Federal Circuit later explained its holding as follows, limiting it to its facts: "To avoid a windfall to the licensee, we expressly limited the implied license to the scope of the licensed claims." *Endo*, 746 F.3d at 1379.

Following *TransCore*, the Federal Circuit in *General Protecht* again considered a licensor's later assertion of a continuation patent against "the same products that were accused" of infringement of parent patents named in a prior settlement agreement. *General Protecht*, 651 F.3d at 1361. Consistent with *AMP*, the court found an implied license because the same products were involved, holding "where . . . continuations issue from parent patents that previously have been licensed **as to certain products**, it may be presumed that, absent a clear indication of mutual intent to the contrary, those products are impliedly licensed under continuations as well." *Id.* (emphasis added). *General Protecht* did not address "divisional" patents (those with "independent or distinct" inventions compared with patents in their parent lineage), nor address assertions against products other than those of the previous license.

*Endo* (not cited by Evertz) is the most recent controlling decision. There, the Federal Circuit confirmed *General Protecht* as limited to its facts. Namely, the court indicated that *TransCore*, *General Protecht* and one other prior decision "stand for the rule that a license or a

11

covenant not to sue enumerating specific patents may legally estop the patentee from asserting *continuations* of the licensed patents in the absence of mutual intent to the contrary." *Endo*, 746 F.3d at 1378 (emphasis in original) (declining to expand the defense to cover progeny of a provisional patent application to which an expressly-licensed patent claimed priority, even though the agreement included "continuations" and "divisionals" of the expressly-licensed patent); *see also id.* at 1373 ("divisionals" included in wording of express license).[4]

### 2. Implied License Does Not Apply Here

In view of these controlling precedents, including the *Endo* decision that Evertz omits from its motion, the defense of implied license must fail. First, Evertz ignores "the scope of the licensed claims" in 2008, despite Evertz's burden to start there. *See id.* at 1379. Evertz includes the four relevant patents as attachments (*i.e.*, the '295 patent and the three patents-in-suit), but waives any discussion of relative claim scope. Mere inspection reveals why. One can easily practice the '295 patent claims without infringing claims of the patents-in-suit, thus indicating no "derogation" occurred when Cascades filed the present suit.[5] Evertz may use the '295 patent for its then-existing products, as long as it does not also use the '659, '723 and '945 patents for newly developed products. Otherwise Evertz receives a windfall for its $1.00 consideration.

---

[4] Evertz tries to argue that *TransCore* renders irrelevant contract wording suggesting no delivery of rights under future-issuing patents. (Dkt. No. 20, at 13-14). But that occurred in the inapposite context of the party suing for recovery against the same products as before. Also, as discussed footnote 5 below, *Endo* confirms that parties remain free to enter agreement terms reflecting their mutual intention to exclude non-included future patents.

[5] Since the "same products" were accused of infringing again, *General Protecht* discounted the patentee's argument that "some" claims of a continuation were narrower than those of the licensed parent patent. *General Protecht*, 651 F.3d at 1361. That decision did not address circumstances where **all** progeny claims are narrower, as here. *General Protecht* also noted that no implied license exists where the patentee "did not intend its license of these products to extend to claims presented in continuation patents." *Id. General Protecht* confirms that parties are "free to contract around an interpretive presumption." *Id.* Thus in *Endo*, the parties contracted around implied license by including a laundry list of patent "progeny" types in the wording of rights, but omitting applications claiming common priority through the same provisional application. *Endo*, 746 F.3d at 1373, 1378-79. Likewise here, where the parties included a laundry list that includes "divisionals" in one part of the overall transaction, their mutual intent clearly excludes divisionals where the parties did not list them.

12

Ignored by Evertz, every independent claim in the '723 and '945 patents requires digital television, including digital audio and digital images. The claims of the '295 patent are broader in this respect – covering systems and methods not limited to digital television. And even though the '659 patent claims do not have this "digital" limitation, each of its claims has terminology about particular use of "artifacts" or "parameters or characteristics" present already in a signal. The '295 patent claims do not have such limitations. Thus, any infringement of the patents-in-suit reflects Evertz's choice to deploy technology beyond any rights granted in the '295 patent. The law does not allow Evertz its requested "windfall" for making such choices.

Second, Evertz presents no decision in which the implied license defense embraced "divisional" patents for admittedly "independent or distinct inventions" (as opposed to continuations), particularly where the relevant agreement omits language about this known category of progeny. On the facts here, the parties showed a clear mutual intent to exclude future divisional patents tracing lineage back to any patent that might otherwise be covered. As discussed above, Evertz knew how to bargain for and receive rights to future "divisional" applications and patents. It simultaneously signed agreements that had such wording. (Ex. A ¶ 1.d.iii; Ex. B ¶ 1.d.x). Evertz would have also known in 2008 that one of the "progeny" divisional patents of the '295 patent (the '499 patent) was already pending as an application, having already been published by then. (Exhibit D). But "divisional" rights are conspicuously absent from the March 10, 2008 Mutual Release, whose paragraph 2 definition of "Cooper Patents" reaches no further than "existing patents" meeting certain qualifications. The Court must respect Evertz's and Mr. Cooper's clear mutual intent to exclude "divisionals" from the definition, even when analyzing alleged implied licenses. *Endo*, 746 F.3d at 1378.

Third, this suit does not impair the value of Evertz's right to sell the same products at issue when it executed the 2008 agreement. *Id.* As discussed above, INTELLITRAK did not exist before 2009. (Dkt. No. 1, ¶ 5). At a minimum, this factual allegation from the Complaint must be accepted as true at this stage of the litigation. Evertz presents no decision (controlling or otherwise) in which the implied license defense created any immunity from suit for products other than those which the parties chose to cover at the time of their earlier agreement.[6]

Finally, Evertz has not shown that implied license by legal estoppel can bind a third party successor to the relevant express license. *Spindelfabrik,* 829 F.2d at 1080-81. Evertz is correct that, for purposes of its present motion, Cascades does not deny that it has assumed Mr. Cooper's rights and obligations with respect to the ***express*** agreements within the 2008 Covenant and Mutual Release. Cascades has not, however, assumed obligations under any ***implied*** license. Evertz cites no authority suggesting that the defense of implied license by legal estoppel bars future patent assertions by third parties who are not signatories to the underlying express agreement, nor successors in implied rights. Cascades is undisputedly such a third party. Evertz therefore does not have an implied license to the patents-in-suit.[7]

### C. Evertz Waived its Separate Argument for Dismissal Made in an Undeveloped Footnote

During the Court's preliminary in-chambers conference, Evertz only sought permission to file a dismissal motion directed to its express license defense. Evertz now purports to argue

---

[6] Since the release of paragraph 2 does not reach liability for future acts, *see* note 2 above, Evertz's argument for implied license based on this paragraph (Dkt. No. 20, at 15) also fails.

[7] Evertz suggests that the Court may grant summary judgment *sua sponte* now, in the event it finds an ambiguity and considers parol evidence. (Dkt. No. 20 at 7 n.9). Evertz is not correct because the Court would have to provide notice and an opportunity for discovery to Cascades in advance of such a *sua sponte* conversion. *See* Fed. R. Civ. P. 56(f); *Cap Export, LLC v. Zinus, Inc.*, 2018 U.S. App. LEXIS 1291, at *4-5 (Fed. Cir. Jan. 18, 2018) (nonprecedential).

separately for dismissal based on an alleged failure to plead infringement with particularity. Evertz puts this argument entirely in an undeveloped footnote. (Dkt. No. 20, at 7 n.10).

Evertz waives this defense by giving it such scant treatment. *Fuery v. City of Chicago*, No. 07 C 5428, 2016 U.S. Dist. LEXIS 135086, at *49 (N.D. Ill. Sept. 29, 2016) ("Arguments raised only in footnotes are waived.") (citing cases). Even if the argument were not waived, Evertz's own authority allows the plaintiff an opportunity to amend (which Cascades would take). *Novitaz, Inc. v. inMarket Media, LLC*, Case No. 16-cv-067950-EJD, 2017 U.S. Dist. LEXIS 81491, at *13 (N.D. Cal. May 26, 2017). Regardless, the specific paragraphs Evertz's footnote attacks contain particularized factual allegations sufficient under the applicable standards. In each case, the paragraphs allege that the Evertz system practices the named limitation, and identifies what feature does so. *See, e.g., Pressure Specialist, Inc. v. Next Gen Mfg.*, No. 17-CV-6582, 2018 U.S. Dist. LEXIS 10987, at * (N.D. Ill. Jan. 24, 2018) (denying motion to dismiss patent infringement complaint filed under *Twombly*, in part because "the Federal Circuit has cautioned against construing claim language to resolve, at the pleading stage, what are effectively non-infringement arguments.").

## CONCLUSION

For the foregoing reasons, Cascades respectfully requests that the Court deny Evertz's motion to dismiss in its entirety.

Dated: February 5, 2018　　　　　　　　　　　Respectfully submitted,

　　　　　　　　　　　　　　　　　　　　　　/s/ Robert P. Greenspoon
　　　　　　　　　　　　　　　　　　　　　　Robert P. Greenspoon (rpg@fg-law.com)
　　　　　　　　　　　　　　　　　　　　　　FLACHSBART & GREENSPOON, LLC
　　　　　　　　　　　　　　　　　　　　　　333 N. Michigan Ave., Suite 2700
　　　　　　　　　　　　　　　　　　　　　　Chicago, Illinois 60601
　　　　　　　　　　　　　　　　　　　　　　(Tel.): 312-551-9500
　　　　　　　　　　　　　　　　　　　　　　(Fax): 312-551-9501
　　　　　　　　　　　　　　　　　　　　　　*Attorneys for Plaintiff, Cascades AV, LLC*

## **CERTIFICATE OF SERVICE**

The undersigned attorney hereby certifies that service of the foregoing document was made on all counsel of record on February 5, 2018 *via* the court's CM/ECF system.

/s/ Robert P. Greenspoon
Robert P. Greenspoon
