# EXHIBIT A

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| CASCADES AV LLC,<br><br>      Plaintiff,<br><br>  v.<br><br>EVERTZ MICROSYSTEMS, LTD,<br><br>      Defendant. | Case No. 17-cv-7881<br>Judge Thomas M. Durkin<br><br>**JURY TRIAL DEMANDED** |

**DEFENDANT'S REPLY MEMORANDUM IN FURTHER SUPPORT OF ITS MOTION
TO DISMISS FOR FAILURE TO STATE A CLAIM UNDER RULE 12(B)(6)**

**TABLE OF CONTENTS**

<u>**Page**</u>

I. INTRODUCTION ................................................................................................................ 1

II. ARGUMENT ....................................................................................................................... 3

    A. Cascades Is Expressly Prohibited from Bringing the Present Claims Arising Out of the '295 Patent ................................................................................ 3

        1. The Instant Suit "Arises out of" a Cooper Patent and Cascades' Cited Authority Is Not to the Contrary ........................................................ 4

        2. The Cooper Agreement as a Whole Supports This Interpretation ............. 6

        3. The Express License Extends to Future Products ...................................... 7

        4. The Express License Is Not Inconsistent with Public Policy .................... 8

    B. Evertz Also Has an Implied License to the Patents-in-Suit .................................. 9

        1. *Transcore* and *General Protecht* Are Directly Analogous and Dictate that Evertz Has an Implied License to the Patents-in-Suit ............ 9

        2. Cascades' Cited Authority Is Inapposite .................................................. 10

        3. The Cooper Agreement Does Not Evidence a Mutual Intent to Exclude Progeny of Cooper Patents ......................................................... 11

        4. The Implied License, like the Express License Granted in the Cooper Agreement, Applies to Future Products and Successors to the Agreement ........................................................................................... 12

    C. Evertz Has Not Waived Its Argument Regarding Particularity ........................... 12

III. CONCLUSION ................................................................................................................. 13

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Cooper v. Comm'r*,
   143 T.C. No. 10 (2014), aff'd, No. 15-70863, Tax. Ct. No. 17284-12 (9th Cir. Dec. 15, 2017) .................................................................................................................2

*Diversified Dynamics Corp. v. Wagner Spray Tech Corp.*,
   106 F. App'x 29 (Fed. Cir. 2004) ..............................................................................4, 5

*Dyson v. City of Calumet*,
   No. 16 C 11509, 2018 WL 509961 (N.D. Ill. Jan. 23, 2018) .......................................13

*Endo Pharmaceuticals Inc. v. Actavis, Inc.*,
   746 F.3d 1371 (Fed. Cir. 2014) ..............................................................................10, 11

*Eon-Net, L.P. v. Flagstar Bancorp, Inc.*,
   No. C05-2129RSM, 2010 WL 9034651 (W.D. Wash. Jan. 4, 2010) .............................5

*FASA Corp. v. Playmates Toys, Inc.*,
   892 F. Supp. 1061 (N.D. Ill. 1995) ................................................................................8

*FDIC v. FBOP Corp.*,
   No. 14 CV 4307, 2017 WL 5891033 (N.D. Ill. Nov. 27, 2017) ....................................9

*Gen. Protecht Grp., Inc. v. Leviton Mfg., Co.*,
   651 F.3d 1355 (Fed. Cir. 2011) ....................................................................5, 9, 10, 12

*Harshbarger v. Hayes & Griffith, Inc.*,
   No. 99 C 3986, 2000 WL 33128263 (N.D. Ill. Aug. 29, 2000) .....................................8

*Intel Corp. v. Negotiated Data Sols., Inc.*,
   703 F.3d 1360 (Fed. Cir. 2012) .....................................................................................9

*O'Donoghue v. Inland Bank & Tr.*,
   No. 15 C 11603, 2016 WL 4651394 (N.D. Ill. Sept. 7, 2016) ....................................13

*Parker v. Franklin Cty. Cmty. Sch. Corp.*,
   667 F.3d 910 (7th Cir. 2012) ......................................................................................13

*Right Field Rooftops, LLC v. Chi. Cubs Baseball Club, LLC*,
   870 F.3d 682 (7th Cir. 2017) ........................................................................................6

*Spindelkfabrik Suessen-Schurr, Stahlecker & Grill GmBH v. Schubert & Salzer Maschinenfabrik Aktiengesellschaft*,
   829 F.2d 1075 (Fed. Cir. 1987) ...................................................................................12

# TABLE OF AUTHORITIES
## (Continued)

**Page(s)**

*Starsight Telecast, Inc. v. Gemstar Dev. Corp.*,
    158 F.R.D. 650 (N.D. Cal. 1994) ................................................................................5

*Taracorp, Inc. v. NL Indus., Inc.*,
    73 F.3d 738 (7th Cir. 1996) ........................................................................................6

*TransCore, LP v. Elec. Transaction Consultants Corp.*,
    563 F.3d 1271 (Fed. Cir. 2009) ..........................................................................9, 11, 12

**Statutes**

35 U.S.C. § 256 ....................................................................................................................6

35 U.S.C. § 291 ....................................................................................................................6

**Other Authorities**

Manual of Patent Examining Procedure §§ 201.06 (9th ed. Rev. Nov. 2015) ...................2, 3, 5, 10

Manual of Patent Examining Procedure §§ 201.07 (9th ed. Rev. Nov. 2015) ................................2

I.      INTRODUCTION

As set forth in Defendant Evertz Microsystems, Ltd.'s ("Evertz") Motion to Dismiss, Plaintiff Cascades AV LLC's ("Cascades") claims for patent infringement are barred by both an express license granted by James Carl Cooper and an implied license arising out of equitable principles set forth under black-letter patent precedent. Both the express and implied licenses bind Cascades, an entity that, by its own judicial admission, was "formed to help Mr. Cooper benefit from the licensing of his lip sync error correction inventions." Compl. ¶ 1. In the face of an unambiguous contract and established patent jurisprudence, then, Cascades' Opposition makes arguments that are (1) misleading with respect to the nature of the Cooper Agreement and Mr. Cooper's relationship with the parties that entered into the prior agreements, and (2) reflective of an apparent misunderstanding of patent law and the relationship between parent and progeny patents.

In its Opposition, Cascades repeatedly refers to the "$1 consideration" that it alleges Evertz paid in return for the releases and covenants under the Cooper Agreement. In so trying to misdirect this Court, Cascades apparently suggests that the Cooper Agreement was of low value and that, therefore, extending any license to the patents currently in suit would constitute an unfair "windfall" for Evertz. But Cascades must know better. Indeed, Cascades' Opposition omits that, on the same day that the Cooper Agreement was executed, Evertz also entered into two license agreements with corporate entities controlled by Mr. Cooper. As part of those license agreements, Evertz paid to Mr. Cooper and his corporate entities *$2 million*, a fact that, again, is omitted in Cascades' brief. The fact that the $2 million payment under the two license agreements was part of the total consideration that Evertz had to pay for patent peace under the Cooper Agreement is not merely a matter of opinion or argument, as the Cooper Agreement itself, on its very first page, states that the releases and covenants granted to Evertz are in consideration of the payments made by Evertz *under all three agreements*. Opp. Ex. C, at 1. Thus, Evertz already paid Mr. Cooper and his entities a significant sum for a license to the Cooper Patents and any other claims "based upon or arising out of" the Cooper Patents.

Cascades' Opposition further attempts to obfuscate by stating that the prior license agreements (all contemporaneous with the Cooper Agreement!) were entered into by Evertz and "third parties," suggesting that therefore they have little or nothing to do with Mr. Cooper or Cascades. But, here too, Cascades must know that this is not right. TLC, for example, was one of the entities to which Evertz paid millions of dollars to settle the prior dispute. Opp. Ex. A, at 1. In a dispute in 2014 with the IRS, in which Mr. Cooper was seeking to avoid paying certain federal taxes, Mr. Cooper made the same argument to the United States Tax Court—that he had little relation to and did not control TLC. The U.S. Tax Court rejected Mr. Cooper's argument, finding that Mr. Cooper did, indeed control TLC, and that Mr. Cooper therefore could not evade paying taxes for TLC's activities. *Cooper v. Comm'r*, 143 T.C. No. 10, 30-31 (2014), aff'd, No. 15-70863, Tax. Ct. No. 17284-12, at *22 (9th Cir. Dec. 15, 2017). Here, Cascades similarly suggests that it should not be bound by any implied license that might bind *Mr. Cooper* under the Cooper Agreement, yet admits, in its Complaint, as noted above that Cascades "was formed to help Mr. Cooper benefit from the licensing" of his patents. Whatever corporate shell games Mr. Cooper has played in the past or may currently be playing cannot distract from the fact that Cascades *is bound by the Cooper Agreement*, as Cascades itself has previously expressly acknowledged.

Cascades' further arguments regarding both the express and implied licenses granted to Evertz reflect a misunderstanding or disregard of foundational patent law and the relationship between parent and progeny patents. Indeed, all of the cases upon which Cascades relies are matters in which the later-issued patent was *not* a progeny of a previously-licensed parent patent, but rather was a patent that had some other more remote relationship, such as a shared common ancestor patent. But those cases and their reasoning are entirely inapposite because only in a parent-progeny relationship is the later-issued child patent *required* to have the same body of inventive subject matter as the parent patent. Manual of Patent Examining Procedure ("MPEP") §§ 201.06-07 (9th ed. Rev. Nov. 2015). This is part of the bargained-for exchange between a patentee and the public: by filing a new patent as a progeny, e.g., divisional of a parent patent,

2

the patentee avers that the child patent contains no new inventive subject matter (MPEP § 201.06), and, in return, the patentee's child patent may get the benefit of the earlier filing date of the parent patent. The latter benefit to the patentee is a potentially powerful tool against challenges to the validity of the progeny patents.

But it is precisely because progeny patents are limited to the same body of inventive subject matter that courts deciding patent cases have held both that the progeny patents "arise from" their parent patents and that giving an express license to a parent patent confers an implied license to its progeny patents. Because all of the cases and authority relied upon by Cascades in its Opposition address non-parent/progeny patents, they are entirely inapplicable, and Cascades' arguments therefore have no basis. Respectfully, Cascades has not been candid in citing these authorities to the Court.

Because Evertz is both expressly and impliedly licensed under the asserted patents, its motion to dismiss respectfully should be granted.[1]

## II.    ARGUMENT

### A.    Cascades Is Expressly Prohibited from Bringing the Present Claims Arising Out of the '295 Patent

In claiming that Evertz has not received an express license to the patents-in-suit, Cascades ignores patent law fundamentals and attempts to rewrite the plain language of the Cooper Agreement. In fact, the meaning of the express license and covenant is clear: Cascades may not bring the present infringement claims.[2]

---

[1] As referenced in both Evertz's Motion and Cascades' Opposition, Evertz has sued Cooper for breach of contract in California state court. At the time of this filing, Cooper is in classic, shell-game fashion contesting jurisdiction and has not yet responded to any of Evertz's discovery requests, on any subject (including jurisdiction), even with formal objections. Contrary to Cascades' insinuation, this Court's scheduling order does not address the California action, much less prohibit that case from proceeding to ordinary, minimally burdensome written discovery. Evertz must note the irony, however, in Cascades complaining about discovery to Cooper while also attempting to misleadingly minimize its connection to Cooper.

[2] The parties appear to continue to agree that the Cooper Agreement is not ambiguous, and may be interpreted by the Court as a matter of law.

3

### 1. The Instant Suit "Arises out of" a Cooper Patent and Cascades' Cited Authority Is Not to the Contrary

In Paragraph 4 of the Cooper Agreement, Cooper unambiguously covenanted that "neither he nor any company owned or controlled by him will bring suit . . . against Evertz . . . *based upon or arising out of* any Cooper Patent" (emphasis added). As Evertz explained in its Motion, the claims at issue clearly "arise out of" the '295 patent (indisputably a Cooper Patent). *See* Mot. at 9-11. As divisionals of the '295 patent, the Patents-in-Suit themselves—and thus any claims for infringement of the Patents-in-Suit—"arise out of" a Cooper Patent. *Id.* at 9. The Patents-in-Suit are progeny of the '295 patent and, according to the patentee, contain the same inventive subject matter as the '295 patent. Therefore claims relating to that subject matter necessarily "arise out of" the '295 patent—a point that has been repeatedly confirmed by courts deciding patent cases. *Id.* Cascades attempts to confuse the issue by stating that the question is whether a "suit" arises out of a patent and not whether a "patent" arises out of a patent. Opp. at 5. But that is a distinction without a difference. Here both the Patents-in-Suit and the claims at issue "arise out of" the '295 patent.

Indeed, Cascades' argument that the instant action does not "arise out of" the '295 patent relies on a misapplication of a non-precedential Federal Circuit opinion from 2004 (not 2014 as Cascades' citation wrongly indicates): *Diversified Dynamics Corp. v. Wagner Spray Tech Corp.*, 106 F. App'x 29 (Fed. Cir. 2004) (nonprecedential). Cascades argues that the Federal Circuit in *Diversified* rejected the argument that claims relating to progeny patents "arise out of" the patent patents. But the Federal Circuit did no such thing, because in *Diversified*, the '123 patent (i.e., the accused patent) was ***not*** a progeny patent of the '176 patent (i.e., the expressly covered patent). Instead, it was simply referred to as a "companion" to the '176 patent in the Cross Reference section of the written description, the '176 patent was described as relevant prior art, and some portions of the drawings, written descriptions, and claims of both patents overlapped. *Id.* at 30-31. Thus, *Diversified* is inapposite and unhelpful to Cascades in *this case*, where the reason the claims at issue here "arise out of" the '295 patent is because the Patents-in-Suit are *divisionals* of that earlier patent. While the '123 patent and the '176 patent in *Diversified* had

4

similarities, they did *not* have the same inventive subject matter and they did not have a parent-child relationship.  In fact, *had* the '123 patent been a divisional of the '176 patent, the lawsuit in *Diversified* would clearly have been dismissed, since the Cross-License in that case expressly applied to the '176 patent and "any continuation, continuation-in-part, divisional, re-examination, or re-issue [thereof]."  *Id.* at 30.  *Diversified* therefore stands only for the proposition that claims for infringement of a patent that is *similar* to a licensed patent, but is *not* family of that patent, may not be dismissed as claims "arising out of" the licensed patent.

The different treatment of progeny patents (on the one hand) and non-progeny but similar patents (on the other hand) is reflective of the value to the patentee of claiming progeny status.  To obtain the Patents-in-Suit as divisional patents, Mr. Cooper represented to the Patent and Trademark Office that the Patents-in-Suit originated from the same subject matter as the Cooper Patent at issue, and as a result he was able to make a claim to the Cooper Patent's priority date.  Mr. Cooper and Cascades cannot both take advantage of the progeny's relationship to the parent when it suits them (during patent prosecution and against later-asserted prior art) and then avoid the consequences of such a relationship when it does not.

In its Opposition, Cascades also argues that a claim relating to a divisional patent cannot "arise out of" the parent patent because a divisional is an "independent or distinct invention" from the invention *claimed* in the parent patent.  Opp. at 7.  But that is immaterial, because divisionals by definition "can claim no new invention not already supported in the earlier issued patents."  *Gen. Protecht Grp., Inc. v. Leviton Mfg., Co.*, 651 F.3d 1355, 1361 (Fed. Cir. 2011); *see* MPEP § 201.06.  In other words, whatever subject matter is contained in the divisional, it must come from (and cannot extend beyond) the subject matter of the parent patent.  That is the basis, again, for the repeated findings by courts deciding patent cases that progeny patents "arise out of" or "arise from" their parent patents—a point that Cascades provides no authority to dispute.  *See, e.g.*, *Starsight Telecast, Inc. v. Gemstar Dev. Corp.*, 158 F.R.D. 650, 655 (N.D. Cal. 1994) (referring to "continuation and continuation-in-part applications *arising out of* the application that matured into the '713 patent."); *Eon-Net, L.P. v. Flagstar Bancorp, Inc.*, No.

5

C05-2129RSM, 2010 WL 9034651, at *1 (W.D. Wash. Jan. 4, 2010) (referring to "various continuation or divisional patents *arising from* an original filing . . .") (emphases added in both). Thus, Cascades' claims for infringement of the divisional patents-in-suit necessarily "arise out of" the parent patents, including from the licensed '295 patent, and this suit is barred.

### 2. The Cooper Agreement as a Whole Supports This Interpretation

As Evertz explained in its Motion, the broad language in Paragraph 4 (barring any "suit . . . based upon or arising out of any Cooper Patent") contrasts with relatively narrow language in Paragraph 2 (referring to "claims . . . for infringement of any existing patent"), indicating that Paragraph 4 applies to claims beyond those alleging infringement of an existing patent (such as those alleging infringement of a divisional of an existing patent). Mot. at 10. *See* Compl. Ex. A, ¶¶ 2, 4; *Right Field Rooftops, LLC v. Chi. Cubs Baseball Club, LLC*, 870 F.3d 682, 690 (7th Cir. 2017) (quoting *Taracorp, Inc. v. NL Indus., Inc.*, 73 F.3d 738, 744 (7th Cir. 1996)) ("[W]hen parties to the same contract use such different language to address parallel issues . . . it is reasonable to infer that they intend this language to mean different things.").

Cascades does not contest that the language in Paragraph 4 is broader than Paragraph 2, but now contends that the distinction is between infringement claims only (Paragraph 2) and other types of actions (Paragraph 4). Opp. at 7. However, all of Cascades' examples of the "multitude of suit-types that might hypothetically 'arise out of' the '295 patent without being infringement suits" (i.e., "claims for a correction of inventorship (35 U.S.C. § 256) or claims of 'interfering' or 'derived' patents (35 U.S.C. § 291, pre- and post-AIA)") are claims that would be brought *against* a patentee and not *by* a patentee. Therefore they cannot support Cascades' argument, because they are not the type of claims that anyone would pay Cooper/Cascades to release or covenant not to bring. Indeed, there is no reading of Paragraph 4 that is consistent with its broad language but that would support Cascades' position. Respectfully, the only correct way to read Paragraph 4 is as providing a covenant covering progeny of the Cooper Patents, just as Evertz has explained. Mot. at 10.

6

Undeterred, though, Cascades claims that Paragraph 4 cannot include divisionals because Evertz specifically called out divisionals in the other license agreements and would also have done so here if that had been the parties' intention. Opp. at 2-3. But this argument fails on multiple fronts. First, the TLC Agreement mentions divisionals when it is defining "Cooper Synch Stripper Patents" with explicit patent numbers, but does not use "divisionals" to *limit* the patents that are licensed, and thus does not suggest that the parties would have used that term in a limiting way in the broad license grant (which does not list any patents by number) at issue here. Opp. Ex. A, ¶ 1.d.i-iii ("'Cooper Synch Stripper Patents' means, collectively, United States Patent No. 5,754,250, . . . and any related applications or patents obtained by TLC."). Moreover, the more apt comparison for Paragraph 4 is to paragraph 8 of the TLC Agreement, which prohibits any suit "based on or arising out of any patent owned or controlled by TLC for infringement with respect to any Evertz Product." *Id*. at ¶ 8. Just like the Cooper Agreement, in which Paragraph 4's covenant is broader than Paragraph 2 and prevents any suit arising out of any Cooper Patent, the TLC Agreement—executed in conjunction with the Cooper Agreement—similarly contains a broad covenant that is *not* limited to the specific patents identified in the Agreement.

Finally, the fact that the release language in the Cooper Agreement is broader than the release language in the TLC Agreement confirms that, in the Cooper Agreement, Cooper did not intend to reserve his right to sue on asserted patents. In Paragraph 9 of the TLC Agreement, TLC expressly reserves its rights to bring infringement claims against certain third parties. The Cooper Agreement contains no such reservation of rights. If Cooper had intended to reserve rights to sue and collect damages on patents arising out of the Cooper Patents, he could have negotiated that position. Instead, the plain language of the contract prohibits this suit arising out of a Cooper Patent.

### 3. The Express License Extends to Future Products

Cascades further claims that the covenant not to sue does not apply to the accused products because INTELLITRAK® did not exist at the time of the agreement. To arrive at this

7

conclusion, Cascades contravenes fundamental contract interpretation principles and remarkably attempts to *rewrite* the language of the contract, to change "against Evertz . . . or end-users *of* its past or current products" into a totally different phrase that does not appear in the contract: "against Evertz . . . *concerning* its past or current products." Opp. at 8. Cascades' attempt to explicitly rewrite the contract proves that the contract, as written, does not support Cascades' interpretation, and Cascades' argument fails as a matter of law. *See, e.g., Harshbarger v. Hayes & Griffith, Inc.*, No. 99 C 3986, 2000 WL 33128263, at *4 (N.D. Ill. Aug. 29, 2000) ("Plaintiff's interpretation of the agreement would require the court to rewrite the signed agreement . . . . This modified construction of the contract is not the contract Plaintiff and Defendant agreed to . . . and there is no reason why this court should modify the agreement of the parties to include additional words to reach the Plaintiff's desired construction . . . ."). The language of the contract is clear: Cooper will not "bring suit . . . against Evertz or . . . end-users of its past or current products." Opp. at 4. That language does not reserve rights *against Evertz*; rather it merely reserves rights against parties who are not "Evertz" and are not "end-users of its past or current products." And, contrary to Cascades' contention, this phrasing is neither illogical nor inconsistent with commercial realities. Opp. at 8. It would be entirely reasonable for Cooper to grant a broader covenant to a known entity (i.e., Evertz) than to unknown entities (yet unidentified end-users of future products).

### 4. The Express License Is Not Inconsistent with Public Policy

As a final, Hail Mary effort to avoid the clear provisions of the contract, Cascades claims that public policy supports its interpretation because a party should not be able to waive unknown intellectual property claims. But these claims were hardly unknown or unknowable at the time of the settlement, and in any event the cases Cascades cites are inapposite. Those cases clearly refer to situations where there was an "unexpected, wholly fortuitous event" or where a release ostensibly extended to wholly unknown or unspecified claims. *FASA Corp. v. Playmates Toys, Inc.*, 892 F. Supp. 1061, 1067-68 (N.D. Ill. 1995) (invalidating general release provision presented by toy company to inventors in initial "idea" meetings that purported to "expressly

8

waive any and all claims of any kind whatsoever, past, present or future, known or unknown . . . .")); *see also FDIC v. FBOP Corp.*, No. 14 CV 4307, 2017 WL 5891033, at *12 (N.D. Ill. Nov. 27, 2017) (Durkin, J.) (discussing a claim regarding a computer glitch which was an "unexpected, wholly fortuitous event," totally outside of the party's control, and release of which would have allowed the defendant to "reap a huge, undeserved windfall"). Here, by contrast, Cooper was an experienced dealer, managing a large patent portfolio, and entering innumerable agreements. The technology at issue in the agreement was clear and the agreement was specific—it did not attempt to universally prohibit all future claims of any kind. Instead, the parties agreed that any claims "arising out of" the patents would be free from suit, and—consistent with how courts deciding patent cases have consistently discussed progeny patents—that includes claims of infringement of future divisional patents having *the same body of inventive disclosure* as the patent existing at the time of the Cooper Agreement. The contract should be interpreted on its face, and the plain language of what the parties negotiated should govern.

### B. Evertz Also Has an Implied License to the Patents-in-Suit

In addition to an express license granted under Paragraph 4 of the Cooper Agreement, Evertz also has an implied license to the Patents-in-Suit, and the Court should dismiss Cascades' complaint on that basis as well.

#### 1. *Transcore* and *General Protecht* Are Directly Analogous and Dictate that Evertz Has an Implied License to the Patents-in-Suit

As the Federal Circuit has explained:

> *TransCore* and *General Protecht* recognized that allowing the patent holder to sue on subsequent patents, when those later patents contain the same inventive subject matter that was licensed, risks derogating rights for which the licensee had paid consideration. In situations where the full extent of an invention disclosed in a patent is licensed, the concerns raised in *General Protecht* and *TransCore* are equally relevant, regardless of whether the case involves reissue patents or continuation patents.

*Intel Corp. v. Negotiated Data Sols., Inc.*, 703 F.3d 1360, 1366-367 (Fed. Cir. 2012) *General Protecht* confirms that it is the *disclosed invention*—and not the scope of the asserted claims—

9

that defines the inquiry. *Gen. Protecht Grp., Inc. v. Leviton Mfg., Co.*, 651 F.3d 1355, 1361 (Fed. Cir. 2011). That reasoning applies to divisionals with equal force as it does to continuation patents, as divisionals necessarily are limited to the inventive subject matter disclosed in their parent applications. MPEP § 201.06.

### 2. Cascades' Cited Authority Is Inapposite

Cascades misinterprets *Endo Pharmaceuticals Inc. v. Actavis, Inc.*, 746 F.3d 1371, 1378 (Fed. Cir. 2014) to argue that the holding of *General Protecht* is limited to continuation patents and does not extend to divisionals. Opp. at 11-12. That is not what *Endo* holds. The patents asserted in *Endo* were not divisionals of an earlier, licensed patent, or even progeny of an earlier licensed patent at all. 746 F.3d at 1378. The only familial relationship was a common ancestor predating all of the patents—the asserted patents and the licensed patent all claimed priority to the same original patent application, but also made different priority claims not in common. *Id.* Thus, as the Federal Circuit explained in *Endo*, "the [asserted patents] do not have the same disclosure as the [licensed] patent, nor do they claim priority to the application that issued as the [licensed] patent." *Id*. at 1374, n.1. Here, unlike in *Endo*, the patentee has averred that the asserted patents *share* the same disclosure, *are* limited to the same inventive subject matter, and *do* claim priority to the licensed patent. *Id.* Therefore *Endo* does not support Cascades, as it does not (nor could it) disturb the binding holding from the Federal Circuit's earlier *TransCore* and *General Protecht* decisions regarding implied license to progeny patents. The holding of *TransCore* and *General Protecht* clearly applies to divisional patents like the Patents-in-Suit— because they are progeny patents—and therefore supports Evertz.

Further, while Cascades argues that its infringement claims would not derogate from Evertz's rights under the Cooper Agreement, Cascades is wrong as a matter of law. *General Protecht* is clear that derogation happens even when the asserted patent is not broader than the licensed patent, and thus Cascades's arguments about allegedly new or narrower limitations in the Patents-in-Suit are irrelevant. 651 F.3d at 1361 (finding implied license based on same disclosures despite fact that new claims had limitations that were not claimed in the licensed

patents). Here, by asserting allegedly narrower patents against Evertz when Evertz has an undisputed license to practice the allegedly broader patent, Cascades is revoking a portion of the rights granted to Evertz under the broader patent and the Cooper Agreement. Cascades tries again to rely on *Endo* for an argument to the contrary, but fails, because *Endo*, again, is inapposite. There, the plaintiff did not assert a progeny patent of a licensed patent, and thus there was no derogation, whereas here the Patents-in-Suit are progeny of a licensed patent and thus there clearly is derogation. 746 F.3d at 1378.

### 3. The Cooper Agreement Does Not Evidence a Mutual Intent to Exclude Progeny of Cooper Patents

Cascades also wrongly claims that the parties to the Cooper Agreement "showed a clear mutual intent to exclude future divisional patents" by failing to explicitly reference those patents. Opp. at 13. This is directly contrary to the very notion of an *implied* license and to the Federal Circuit's holding in *TransCore*. *TransCore, LP v. Elec. Transaction Consultants Corp.*, 563 F.3d 1271 (Fed. Cir. 2009). In *TransCore*, the parties actively attempted to limit the scope of the license by including a provision that "[t]his Covenant Not To Sue shall not apply to any other patents . . . to be issued in the future." *Id.* at 1279. Still, the court held that while "[t]his language may protect TransCore against broad claims that future patents generally are impliedly licensed, [] it does not permit TransCore to derogate from the rights it has expressly granted and thus does not preclude a finding of estoppel." *Id.* The mere fact that the Cooper Agreement "omits language about [divisionals]" is irrelevant, because the Agreement grants an express license to practice the '295 patent and thus protects Evertz against Cascades' effort to derogate from those rights. Of course, as described above (Section II.A.2), the TLC Agreement demonstrates that Cooper knew how to expressly reserve rights when he intended to do so. Under *TransCore*, the existence of an express provision declining to extend the license to progeny patents might not be dispositive. But *the lack* of such a provision, particularly in an agreement drafted by sophisticated parties, certainly should be.

11

### 4. The Implied License, like the Express License Granted in the Cooper Agreement, Applies to Future Products and Successors to the Agreement

Finally, Cascades argues that, to the extent an implied license exists, it does not apply to new products or to a "third party successor." Opp. at 14. But a licensee's rights under an implied license are "necessarily coextensive with" the rights received under the express license. *See Gen. Protecht*, 651 F.3d at 1360 (citing *TransCore*, 563 F. 3d at 1279-80). As explained above, *supra* Section II.A.3, the express license here applies to new products[3] and to "any company owned or controlled by [Cooper]." Fundamentally, because Cascades does not dispute that it is bound by the express license granted to Evertz in the Agreement (Opp. at 14), Cascades is necessarily bound by the implied license grant as well.[4] *Id.*

## C. Evertz Has Not Waived Its Argument Regarding Particularity

In an abundance of caution and to prevent Cascades later claiming that Evertz had waived the argument by failing to include it, Evertz included an additional argument regarding Cascades' failure to plead infringement with the required particularity in its Motion to Dismiss. Cascades' bright-line claim that any argument made in a footnote is waived vastly overstates the case law. Judges generally treat arguments raised exclusively in a footnote as waived only when

---

[3] In addition to Paragraph 4, and as explained in Evertz's Motion, Paragraph 2 of the Cooper Agreement also operates as an implied license that explicitly covers future products. Mot. at 15.

[4] Cascades relies on *Spindelkfabrik*, but that case involved an outlying and attenuated implied license claim. *See Spindelkfabrik Suessen-Schurr, Stahlecker & Grill GmBH v. Schubert & Salzer Maschinenfabrik Aktiengesellschaft*, 829 F.2d 1075, 1080-81 (Fed. Cir. 1987). The defendant there asserted, essentially, that since the plaintiff had acquired Patent A (a patent to which the defendant had a license), the plaintiff also could not sue the defendant for infringement of Patent B (a totally unrelated patent that plaintiff separately owned). *Id.* The equivalent case here would be if Evertz was attempting to use the Cooper Agreement to defend itself against infringement claims by Cascades based on unrelated patents that Cooper had never owned. *Spindlekraft* has no bearing on whether Cascades is bound by the Cooper Agreement as to the patents that the Cooper Agreement actually covers. Similarly, *Spindelkfabrik* also does not stand for the proposition that "[w]hen the underlying express contract is merely a covenant not to sue under specific patents, and not a license, no legal estoppel arises." Opp. at 10, n.3. In fact, the *Spindelkfabrik* court stated that "[i]f the agreement were merely a promise not to sue *under the listed patents only*, there could be no estoppel against Murata asserting the [later-acquired patent]." 829 F.2d at 1081, n.8 (emphasis added). In other words, the court was drawing a distinction between an agreement that covered later-acquired patents and one that did not, *not* between licenses and covenants not to sue.

the argument is insufficiently developed. *See O'Donoghue v. Inland Bank & Tr.*, No. 15 C 11603, 2016 WL 4651394, at *4 (N.D. Ill. Sept. 7, 2016); *Parker v. Franklin Cty. Cmty. Sch. Corp.*, 667 F.3d 910, 924 (7th Cir. 2012) (declining to consider an argument in a footnote when it "consist[ed] of four sentences and contain[ed] no citation to authority"). Here, Evertz identified specific exemplary shortcomings for asserted claim elements of each of the three asserted patents. To refuse to consider a thoughtful, reasoned argument (particularly one that, according to Cascades can be further developed later) because it happens to be in a footnote would impermissibly elevate form over function. *See Dyson v. City of Calumet*, No. 16 C 11509, 2018 WL 509961, at *3 (N.D. Ill. Jan. 23, 2018).

### III. CONCLUSION

For these reasons and those described in Defendant's Memorandum of Law in Support of Its Motion to Dismiss for Failure to State a Claim under Rule 12(b)(6), Evertz respectfully requests that the Court grant Evertz's motion to dismiss.

Respectfully submitted,

Dated: February 12, 2018          */s/* Rebekah H. Parker

Andrew D. Campbell
Rebekah H. Parker
NOVACK AND MACEY LLP
100 North Riverside Plaza
Chicago, IL 60606
Telephone: (312) 419-6900
Facsimile: (312) 419-6928
acampbell@novackmacey.com
rparker@novackmacey.com
*Local Counsel for Defendant*

Thad A. Davis (*admitted pro hac vice*)
Y. Ernest Hsin (*admitted pro hac vice*)
GIBSON DUNN & CRUTCHER LLP
555 Mission Street, Suite 3000
San Francisco, CA 94105
Telephone: (415) 393-8200
Facsimile: (415) 393-8306
tdavis@gibsondunn.com
ehsin@gibsondunn.com

Stuart Rosenberg
1881 Page Mill Rd
Palo Alto, CA 94304
Telephone: (650) 849-5300
Facsimile: (650) 849-5333
srosenberg@gibsondunn.com

*ATTORNEYS FOR DEFENDANT*
*EVERTZ MICROSYSTEMS, LTD.*